

JUDGE ABRAMS          13 CV 817

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DAVID YOUNG, individually and on behalf of all others similarly situated,

                        Plaintiff,

v.

JAN-MICHIEL HESSELS, MARSHALL CARTER, DUNCAN NIEDERAUER, DOMINIQUE CERUTTI, ANDRE BERGEN, ELLYN BROWN, PATRICIA CLOHERTY, SIR GEORGE COX, SYLVAIN HEFES, DUNCAN MCFARLAND, JAMES MCNULTY, LUIS PALHA DA SILVA, ROBERT SCOTT, JACKSON TAI, RIJNHARD VAN TETS, SIR BRIAN WILLIAMSON, NYSE EURONEXT, INTERCONTINENTALEXCHANGE, INC., and BASEBALL MERGER SUB, LLC,

                        Defendants.

Case No.

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

---

**CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY**
**AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff David Young ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

**NATURE OF ACTION**

1.    Plaintiff brings this class action on behalf of the public stockholders of NYSE Euronext ("NYSE" or the "Company") against members of NYSE's Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary

duty arising out of their attempt to sell the Company to IntercontinentalExchange, Inc. ("ICE") by means of an unfair process and for an unfair price, and against the Company and ICE for aiding and abetting the Board's breaches. Plaintiff also brings a claim *individually* against Defendants for their violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On December 20, 2012, ICE and the Company announced a definitive agreement under which ICE, through its wholly-owned subsidiary, Baseball Merger Sub, LLC ("Merger Sub"),  will acquire all of the outstanding shares of NYSE in a transaction in which NYSE stockholders can elect to receive:  (i) $33.12 in cash; (ii) 0.2581 of an ICE share; or (iii) a mix of $11.27 in cash plus 0.1703 of an ICE share for each share of NYSE stock, subject to a maximum cash consideration of approximately $2.7 billion (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $8.2 billion, comprised of approximately 67% stock and 33% cash.

3.      As discussed below, the Proposed Transaction was approved by an interested Board which, from the outset, focused on pursuing their own interests  ahead of the interests of the Company's public stockholders by favoring a transaction with ICE. Most egregiously, prior to reaching agreement on all material terms in the agreement and plan of merger with ICE ("Merger Agreement"), defendants secured for themselves, post-merger positions with ICE and on the ICE board of directors.  In particular, defendant Duncan Niederauer ("Niederauer"), NYSE's Chief Executive Officer ("CEO"), will become president of the combined company.  Moreover, four other members of NYSE's

Board will have board seats in the new company.  They also stand to receive an undisclosed financial windfall from cashing out their restricted stock.

4.      Over the course of the past couple of years, the Board, led by defendant Niederauer, kept an open line of communication with ICE concerning a potential sale of the Company.  Negotiations with ICE began in September 2012 and, by October 5, 2012, ICE began conducting due diligence.  Despite ongoing negotiations with ICE concerning the sale of the Company, the Board, with the help of its financial advisor Perella Weinberg Partners LP ("Perella Weinberg"), waited until six weeks after ICE began conducting due diligence to contact other potentially interested parties.  To make matters worse, the Board only contacted *one* party (Company A) and failed to contact other parties that had previously expressed interest in acquiring NYSE to create a competitive bidding process and reasonably inform the Board of NYSE's market value.

5.      The Board then rushed into a deal with ICE and agree to a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or continuing discussions with Company A.

6.      Given NYSE's recent strong performance as well as its future growth prospects, the consideration shareholders will receive is inadequate and undervalues the Company.  The Board breached its fiduciary duties by agreeing to the Proposed Transaction for grossly inadequate consideration.  Indeed, Perella Weinberg's own Discounted Cash Flow Analysis supports a price as high as $33.65 per share.

7.      Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other

bidders from making a successful competing offer for the Company. Specifically, pursuant to the Merger Agreement, defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirors or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that provides ICE with five (5) business days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay ICE a termination fee of up $300 million in order to enter into a transaction with a superior bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of NYSE.

8.      Moreover, on the same day that NYSE and ICE executed the Merger Agreement, the two companies entered into a clearing services agreement (the "Clearing Services Agreement"). Pursuant to the Clearing Services Agreement, NYSE and ICE agreed that for two years, a wholly-owned subsidiary of ICE will provide clearing services in London for NYSE's valuable European derivatives business, known as NYSE Liffe. The Clearing Services Agreement further acts to prevent other bidders from coming forward by locking up NYSE Liffe, NYSE's most prized and profitable business, for two years, because even if they acquired NYSE, they would have to wait two years to acquire NYSE Liffe.

9.      On January 28, 2013, ICE filed a Form S-4 Registration Statement (the "Registration Statement"), which contains the joint proxy statement of NYSE and ICE, with the United States Securities and Exchange Commission ("SEC") in support of the

Proposed Transaction. The Registration Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

10.     The Individual Defendants have breached their fiduciary duties of loyalty and due care and violated the federal securities laws, and ICE and Merger Sub have aided and abetted such breaches by NYSE's officers and directors. Plaintiff seeks to enjoin the Proposed Transaction unless and/or until defendants cure the alleged misconduct.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

12.     Additionally, this Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

13.     Venue is proper in this district because: (i) the conduct at issue took place and had an effect in this district; (ii) NYSE maintains its principal place of business in this District; (iii) one or more of the defendants either resides in or maintains executive offices in this District; (iv) a substantial portion of the transactions and wrongs

complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

14.     Plaintiff is, and has been at all relevant times, the owner of shares of NYSE common stock.  Plaintiff resides in the state of California.

15.     NYSE is a corporation organized and existing under the laws of the State of Delaware.  The Company maintains its principal executive offices at 11 Wall Street, New York, NY 10005.

16.     Defendant Marshall Carter ("Carter") has been a director of the Company since 2007.  Upon information and belief, Carter is a citizen of and resides in Massachusetts.

17.     Defendant Niederauer has been Chief Executive Officer and a director of the Company since 2007.  Upon information and belief, Niederauer is a citizen of and resides in New Jersey.

18.     Defendant Dominique Cerutti ("Cerutti") has been a director of the Company since 2011. Cerutti has served as the Company's President, deputy chief executive officer, and head of Global Technology since January 2010.  Upon information and belief, Cerutti is a citizen of and resides in France.

19.     Defendant Andre Bergen ("Bergen") has been a director of the Company since 2010.  Upon information and belief, Bergen is a citizen of and resides in Belgium.

20.     Defendant Ellyn Brown ("Brown") has been a director of the Company and its predecessors since 2005.  Upon information and belief, Brown is a citizen of and resides in Maryland.

21.     Defendant Patricia Cloherty ("Cloherty") has been a director of the Company since 2009.  Upon information and belief, Cloherty is a citizen of and resides in New York.

22.     Defendant Sir George Cox ("Cox") has been a director of the Company and its predecessors since 2002.  Upon information and belief, Cox is a citizen of and resides in the United Kingdom.

23.     Defendant Sylvain Hefes ("Hefes") has been a director of the Company since 2007.  Upon information and belief, Hefes is a citizen of and resides in France.

24.     Defendant Duncan McFarland ("McFarland") has been a director of the Company and its predecessors since 2006.  Upon information and belief, McFarland is a citizen of and resides in Massachusetts.

25.     Defendant James McNulty ("McNulty") has been a director of the Company and its predecessors since 2005.  Upon information and belief, McNulty is a citizen of and resides in Illinois.

26.     Defendant Luis Palha da Silva ("Silva") has been a director of the Company since August 2012.  Upon information and belief, Silva is a citizen of and resides in Portugal.

27.     Defendant Robert Scott ("Scott") has been a director of the Company since 2010.  Upon information and belief, Scott is a citizen of and resides in New York.

28.     Defendant Jackson Tai ("Tai") has been a director of the Company since 2010.  Upon information and belief, Tai is a citizen of and resides in Connecticut.

29.     Defendant Rijnhard van Tets ("Tets") has been a director of the Company and its predecessors since 2003.  Upon information and belief, Tets is a citizen of and resides in the Netherlands.

30.     Defendant Sir Brian Williamson ("Williamson") has been a director of the Company and its predecessors since 2002.  Upon information and belief, Scott is a citizen of and resides in the United Kingdom.

31.     Defendant Jan-Michiel Hessels ("Hessels") has been Chairman of the Board since 2007.  Upon information and belief, Hessels resides outside of the United States.

32.     Defendants referenced in ¶¶ 16 through 31 are collectively referred to as the Individual Defendants and/or the Board.

33.     Defendant ICE is a Delaware corporation with its headquarters located at 2100 RiverEdge Parkway, Suite 500, Atlanta, GA 30328. ICE is leading operator of regulated futures exchanges and over-the-counter markets for agricultural, currency, emissions, energy, and equity index contracts. ICE serves customers in more than 70 countries.

34.     Defendant Merger Sub is a Delaware limited liability company wholly owned by ICE that was created for the purposes of effectuating the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action with respect to his state law breach of fiduciary duty and aiding and abetting claims on behalf of all persons and/or entities that own NYSE common stock (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. According to the Merger Agreement, as of December 18, 2012, 242,607,620 shares of common stock were represented by the Company as outstanding. All members of the Class may be identified from records maintained by NYSE or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

37.    Questions of law and fact are common to the Class, including, *inter alia*, the following:

> (i)    Whether the Individual Defendants breached their fiduciary duties of undivided loyalty or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

      (ii)     Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonably available under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

      (iii)    Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

      (iv)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;

      (v)     Whether ICE, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

      (vi)    Whether the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

38.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

39.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## FURTHER SUBSTANTIVE ALLEGATIONS

**I.     Company Background and Its Poise For Growth**

41. NYSE is a leading global operator of financial markets and provider of innovative trading technologies. The Company's exchanges in Europe and the United States trade equities, futures, options, fixed-income, and exchange-traded products.

*42.* As reported in the Company's February 10, 2012 press release, NYSE enjoyed a successful fiscal 2011. The Company reported full-year net revenue of $2.67 million, representing a 6% increase as compared to 2010 full-year net revenue of $2.51 million. Moreover, Michael S. Geltzeiler ("Geltzeiler"), the Company's Group Executive Vice President and Chief Financial Officer, commented in the press release that the Company was optimistic about its future and was proactively taking steps to improve its long term business prospects. Specifically, Geltzeiler was quoted as saying:

> The progress that we have made over the past year has well-positioned us for 2012 and beyond. While the near-term outlook for trading volumes and currencies remains clouded, we are continuing to focus on those areas of our business model that we control to create value for shareholders. We are targeting a two-year plan that, with only modest improvement in the operating environment, will drive higher levels of earnings per share growth through a combination of targeted revenue growth initiatives, accelerated cost efficiency efforts and disciplined deployment of capital. We will provide the investment community with details on our two-year plan at our investor day in April.

43.     On April 2, 2012, the Company hosted its Investor Day 2012 during which it made a lengthy presentation about the Company's business outlook. Importantly, the Company introduced the two-year plan that Geltzeiler referenced in the February 10, 2012 press release. The two-year plan involved three main elements that the Company believed would create value for shareholders. First, the Company would focus on capturing growth opportunities. Second, NYSE would improve efficiencies in its business. Third, NYSE would deploy its capital in strategically beneficial ways.

44.     In the Company's April 30, 2012 press release, Defendant Niederauer commented on how successfully NYSE was executing its two-year plan stating, in relevant part:

> Looking ahead in 2013 and 2014, we are focused on creating value by enhancing the underlying earnings power of the Company and solidly executing on the three core pillars of our earnings growth strategy outlined at our investor day: capturing growth opportunities in new markets and leveraging inter-asset class opportunities; delivering efficiencies through disciplined cost management and optimizing our shared services infrastructure; and strategically deploying our capital.

45.     Niederauer reaffirmed that the Company was successfully executing on its strategy in the Company's August 3, 2012 press release, stating:

> We made good progress in executing against our strategy to unlock the inherent value of our community.  We have realigned our client facing and product teams to create a generalist sales force that brings to bear our full-suite of solutions for our clients.  We have given notice that we will fully insource clearing and launch NYSE Clearing in June 2013, which will provide us with cost savings and ultimately provide new revenue and better position the Company for the OTC opportunity.  Lastly, we made significant headway with our NYSE Liffe U.S. platform with the launch of our GCF repo futures product which fills the increasing market need for a reliable and transparent benchmark for bank funding costs.'

46.     Instead of permitting the Company's shares to trade freely and allowing its shareholders to reap the benefits of the Company's future business prospects, the Individual Defendants inexplicably agreed to sell the Company to ICE for short-term profits and at the expense of the interests of the Company's shareholders without conducting any meaningful process or market check.

## II.     The Board Breached its Fiduciary Duties by Failing to Conduct Any Meaningful Sales Process or Allow for a Go-Shop To Obtain a Fair Price For NYSE's Public Shareholders

47.     Rather than attempt to obtain the best price possible for shareholders, the Board breached its fiduciary duties by failing to conduct an adequate market check (contacting only one potential interested party other than ICE despite interest from several parties over the course of the last year) and running a sales process that unreasonably favored a deal with ICE by providing them with a significant head-start with negotiations and due diligence.

48.     NYSE failed to sell the Company in 2011 despite conscious efforts to execute a transaction.  Specifically, on February 15, 2011, NYSE and Deutsche Börse AG announced that they had reached a business combination agreement.  Before the transaction could be consummated, ICE and NASDAQ OMX Group, Inc. submitted a joint proposal to purchase the Company.  Shortly thereafter, however, on April 16, 2011, they announced that they were dropping their bid after discussions with representatives from the Antitrust Division of the U.S. Department of Justice ("DOJ") revealing the DOJ's antitrust concerns with the potential combination.  On February 1, 2012 the

European Commission struck down the proposed deal between NYSE and Deutsche Börse AG on the grounds that that it would be anticompetitive.

49.     Despite the failure to strike a deal, Defendant Niederauer kept an open line of communication with the CEO of ICE, Jeffrey Sprecher ("Sprecher").  Indeed, by early September 2012, Niederauer and Sprecher began general discussions about a business combination between NYSE and ICE.

50.     On September 13, 2012, NYSE's Board met to discuss corporate strategy and evaluated three potential strategic alternatives: (1) remain a stand-alone company, (2) consider potential partners for merger and acquisition transactions inside and outside the exchange industry, and/or (3) separate or sell aspects of its business, including its European derivatives business. The Board instructed management to develop ideas and focus its efforts around these three options.

51.     At a September 25, 2012 meeting between Sprecher, Niederauer, and other representatives from the two companies, Sprecher indicated that ICE was interested in pursuing a purchase of NYSE.  As soon as October 5, 2012, ICE began conducting due diligence on NYSE. Several weeks later, on October 19, 2012, ICE sent NYSE's management a set of proposed terms to purchase the Company. The offer included a provision that two NYSE directors would have seats on the board of the combined company even though the parties were not even close to agreeing upon all of the other material terms of a merger agreement.

52.     At this point in the negotiations it was clear that the Company was favoring a transaction with ICE in order to secure their post-merger employment

positions.   For instance, on October 25, 2012 the Board discussed the potential transaction with ICE in detail but gave little attention to parties that "approached [NYSE] in the past … the most recent being from a large U.S.-based derivatives exchange that expressed a potential but non-specific interest in components." In fact, there is no evidence that NYSE ever reached out to the parties that previously indicated an interest in purchasing all or portions of the Company.

53.   ICE's due diligence continued and it submitted revised proposals to purchase the Company on November 11 and November 18, 2012. In its November 18, 2012 offer, ICE proposed acquiring the Company for 0.1703 of a share of ICE common stock plus $11.27 per share in cash, roughly equivalent to $33.00 per share.

54.   On November 25, 2012, about six weeks after ICE started conducting due diligence, NYSE finally decided to contact only *one* additional party identified in the Registration Statement as Company A – a large industrial and financial holding company – to gauge whether it was interested in pursuing a transaction to purchase the Company. It is unclear from the Registration Statement why the Company decided to wait so long before contacting additional parties, why the Board decided to contact only one party, whether the Board considered other parties and how the Board narrowed the list to only one party.

55.   Company A submitted a proposal that was "lower" than ICE's November 18, 2012 offer. Additionally, Company A conditioned its purchase of NYSE on the Company's sale of its European derivatives business at a minimum price determined by Company A.

56.     Despite receiving interest from other parties in the past for the Company's derivative business, there is no indication that NYSE Board reached out to inquire if the parties that previously expressed an interest were still interested or whether the Board even considered doing so. The NYSE Board then focused its negotiations exclusively with ICE, its favored partner.

57.     On December 12, 2012, "Niederauer and several members of the NYSE [] board" met with Sprecher to discuss "the transaction and ICE's view of the combined company." Unsurprisingly, Niederauer and other corporate insiders secured positions for themselves in the combined company, with Niederauer serving as president and four members of the NYSE Board will have board seats in the combined company.

58.     On December 20, 2012, the parties signed the Merger Agreement and the Board agreed to sell NYSE to ICE for 0.1703 of a share of ICE common stock plus $11.27 per share in cash -- the exact consideration ICE proposed on November 18, 2012, more than a month earlier. The supine Board made no attempt to negotiate for an increased price and just accepted ICE's offer with no attempt to create any sort of competitive process to reasonably inform itself of NYSE's true market value.

59.     Importantly, the Company failed to negotiate a collar to prevent the value of the Proposed Transaction consideration from decreasing below a certain amount as a result of ICE's stock price decreasing. Negotiating for a collar is especially important here, where it is contemplated that 67% of the consideration will be in ICE stock.

### III.   The Board Breached Its Fiduciary Duties By Entering Into the Proposed Transaction For Consideration That Significantly Undervalues the Company and Fails to Maximize Shareholder Value

60.     Despite the Company's recent strong performance and implementation of strategic plans to position the Company for long-term growth, the Company entered into the Merger Agreement with ICE.

61.     Recent attempts to acquire NYSE have yielded significantly higher prices for the Company than the Proposed Transaction. In 2011, for instance, ICE and Nasdaq OMX Group attempted to purchase NYSE for $11 billion, or roughly $3 billion more than the approximate value of the Proposed Transaction.

62.     Furthermore, the proposed consideration fails to consider that the individual pieces of NYSE might be more valuable to potential bidders than the sum of the parts. In fact, in a December 20, 2012 press release ICE announced that it will explore an initial public offering of NYSE's Euronext division as a Continental European-based entity following the closing of the Proposed Transaction. Other commentators have also stated that the "NYSE is worth much more sliced up than it's worth as a whole."

63.     In addition, the Proposed Transaction consideration fails to adequately compensate NYSE's shareholders for the significant synergies created by the Proposed Transaction. The Proposed Transaction is a strategic merger for ICE. In a letter to his colleagues, which was filed with the SEC on December 20, 2012, ICE's chief executive officer, Jeffrey Sprecher, wrote:

> This transaction facilitates operational efficiencies through the consolidation of technology platforms across execution, post-trade and clearing systems. Our combined product offerings and services will bring together the preeminent equity, equity options and listings franchise with

important commodities markets, technology resources and innovative
leadership. Further, we believe we can unlock significant value for
customers and shareholders by continuing to support the evolution of
markets, by continuing to innovate, by continuing to deliver industry
leading risk management services and by continuing to deliver strong
financial returns and cash generation.

64.     Moreover, in a December 20, 2012 press release, ICE disclosed that the

Proposed Transaction is "expected to be highly accretive to earnings in the first year after

closing and produce returns on invested capital above the transaction's cost of investment

beginning in year two." Despite the significant synergies inherent in the transaction for

ICE, however, the Board failed to secure a fair price for the Company, either for the

intrinsic value of its assets or the value of the Company's assets to ICE.

65.     ICE is seeking to acquire the Company at the most opportune time, at a

time when the Company is performing very well and is positioned for tremendous

growth.

## IV.    The Materially Conflicted Financial Advisors

66.     The deal negotiations and process leading up to the Proposed Transactions

were tainted with conflict and self-interest by the Company's conflicted financial

advisors.

67.     Although Perella Weinberg served as NYSE's primary financial advisor,

the Company also received financial advice for BNP Paribas, Blackstone Advisory

Partners, Citigroup, Goldman Sachs., and Moelis & Co.

68.     Morgan Stanley served as ICE's principle financial advisor, but ICE also

received financial advice from BMO Capital Markets Corp., Broadhaven Capital

Partners, JPMorgan, Lazard, Societe Generale Corporate & Investment Banking, and Wells Fargo Securities, LLC.

69.     Several of the financial advisory firms advising ICE in the Proposed Transaction advised NYSE in the Company's negotiations with Deutsche Börse AG in 2011. Specifically, Morgan Stanley and Societe Generale provided services for NYSE in its failed merger with Deutsche Börse AG.

70.     Additionally, both defendants Niederauer and Hefes held high-ranking positions with Goldman Sachs, the same firm that provided certain financial projections to Perella Weinberg that Perella used and relied upon in its financial analyses supporting its Fairness Opinion.  Specifically, Niederauer was a managing director and co-head of the Equities Division Execution Services for Goldman Sachs over the course of his 22 year career with the firm.  Defendant Hefes was previously head of Goldman Sach's European Wealth Management and European private banking business.

71.     Defendants Tai and Scott also have close ties with financial advisory firms involved in the deal.  For instance, Tai worked for JP Morgan for 25 years as a managing director in the Investment Banking Division and Scott worked for Morgan Stanley in various roles from 1970 until 2003.

V.     **The Preclusive Deal Protection Devices**

72.     In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

73.     Section 4.2 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by ICE. Section 4.2 demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.

74.     Pursuant to §4.2 of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify ICE of the bidder's identity and the terms of the bidder's offer. Thereafter, § 4.2 demands that should the Board determine to enter into a superior competing proposal, it must grant ICE five (5) business days in which the Company must negotiate in good faith with ICE (if ICE so desires) and allow ICE to amend the terms of the Merger Agreement to make a counter-offer so that the competing proposal no longer "constitutes a Superior Proposal." In other words, the Merger Agreement gives ICE access to any rival bidder's information and allows ICE a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor ICE and piggy-back upon the due diligence of the foreclosed second bidder.

75.     The Merger Agreement also provides that a termination fee of $300 million must be paid to ICE by NYSE if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer. Additionally, if the NYSE Board changes it recommendation under the terms of the Merger Agreement

for a reason other than to enter a superior transaction, NYSE must pay ICE a $450 million termination fee.

76.     Moreover, on the same day that NYSE and ICE executed the Merger Agreement, the two companies entered into the Clearing Services Agreement.  Pursuant to the Clearing Services Agreement, NYSE and ICE agreed that for two years, a wholly-owned subsidiary of ICE will provide clearing services in London for NYSE's valuable European derivatives business, known as NYSE Liffe. The Clearing Services Agreement further acts to prevent other bidders from coming forward by locking up NYSE Liffe, NYSE's most prized and profitable business, for two years, because even if they acquired NYSE, they would have to wait two years to acquire NYSE Liffe

77.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

## VI.     The Individual Defendants' Self-Dealing

78.     Rather than negotiate a transaction that was in the best interests of NYSE's shareholders, the Company's executive officers and directors were acting to better their own personal interests through the Proposed Transaction.

79.     Specifically, defendant Niederauer negotiated a position for himself in the combined company and that other insiders, including four members of NYSE's current Board, will be directors on the board of the combined company.

80.     Additionally, several of NYSE's executive officers hold unvested annual bonus restricted stock units and unvested long-term incentive plan restricted stock units. Upon the consummation of the Proposed Transaction, time-vesting NYSE annual bonus restricted stock units granted prior to or after the signing of the Merger Agreement and time-vesting NYSE long-term incentive plan restricted stock units granted prior to the signing of the Merger Agreement will "vest in full and become distributable in shares of common stock of ICE, while time-vesting long-term incentive plan restricted stock units granted after the signing of the [M]erger [A]greement will be converted into substantially equivalent restricted stock units denominated in shares of common stock of ICE…".

81.     Tellingly, the Proxy does not disclose the value of unvested annual bonuses, restricted stock units and unvested long-term incentive plan restricted stock units held by the Company's executive officers and directors.

82.     Thus, while the Proposed Transaction is not in the best interest of NYSE shareholders, it will produce lucrative benefits for the Company's officers and directors

VII.    **The Materially Misleading Registration Statement**

83.     To make matters worse, on January 28, 2013, ICE and the Company filed a joint proxy statement as part of ICE's Form S-4 Registration Statement with the SEC in an attempt to convince shareholders to vote in favor of the Proposed Transaction. The Registration Statement fails to provide the Company's shareholders with material

information and/or provides them with materially misleading information critical to the total mix of information available to the Company's shareholders concerning the financial and procedural fairness of the Proposed Transaction. Without such information NYSE shareholders cannot make a fully informed decision about whether to vote in favor of the Proposed Transaction.

> **A.    Material Omissions Concerning the Projections Prepared by the Company's Management**

84.    The Registration Statement fails to disclose material information concerning NYSE's and ICE's prospective financial information.

85.    With regards to NYSE's prospective financial information, the Registration Statement states that NYSE provided financial forecasts for fiscal years 2012 and 2013, but that the "2014 estimated data provided to ICE and Perella Weinberg were based on publicly available financial forecasts relating to NYSE [] published by Goldman, Sachs & Co."  Furthermore, the Registration Statement states that the financial forecasts published by Goldman Sachs & Co. ("Goldman Sachs") did not include Adjusted EBITDA (unlike years 2012 and 2013) and that Goldman Sachs's financial forecasts were "not calculated using the same methodology that NYSE [] used for purposes of its unaudited prospective financial information." The Registration Statement should, but fails, to disclose why NYSE used Goldman Sach's prospective financial forecast for fiscal 2014 but not 2012 or 2013, the difference in methodologies (if any), and the results of the differing methodologies on the prospective information.

86.     The Registration Statement should also disclose management's financial projections for total assets, and other critical components that comprise EBITDA and Net Income.

87.     Moreover, the financial analyses of Perella Weinberg and ICE's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), repeatedly reference two different sets of forecasts for NYSE: the budget case forecast and the volume growth case forecast.  The Registration Statement, however, fails to provide the projections for either the budget case forecast or the volume growth case forecast upon which Morgan Stanley relied.

88.     Management's financial projections are critical to NYSE shareholders' ability to determine whether they are getting a fair price for their shares and whether NYSE is better off pursuing other strategic alternatives.

**B.     Material Omissions Concerning Perella Weinberg's Financial Analyses**

89.     The Registration Statement fails to disclose certain data and inputs underlying the financial analyses supporting the fairness opinion of the Company's financial advisor, Perella Weinberg, including:

90.     With respect to the *Selected Publicly Traded Companies Analysis*, the Registration Statement fails to disclose various material aspects of Perella Weinberg's analysis, including:

(a)     All multiples and ratios for each of the comparable companies;

(b)     The objective criteria Perella Weinberg utilized to select the companies it deemed comparable to NYSE and ICE;

(c)     For its analysis of NYSE, Perella Weinberg's basis for choosing a range of 7.5x to 8.5x to apply to EV / 2012E EBITDA and a range of 11.0x to 13.0x to apply to 2012E earnings per share;

(d)     For its analysis of NYSE, Perella Weinberg's basis for choosing a range of 6.5x to 7.5x to apply to EV / 2013E EBITDA and 9.5x to 11.x to apply to 2013E earnings per share;

(e)     The relative weight that Perella Weinberg gave to the NYSE budget case and growth case when selecting the multiples and, more importantly, whether the Board expressed an opinion as to which case was more representative of the Company's future business prospects;

(f)     For its analysis of ICE, Perella Weinberg's basis for choosing a range of 8.5x to 9.5x to apply to EV / 2012E EBITDA and a range of 17.0x to 19.0x to apply to 2012E earnings per share; and

(g)     For its analysis of ICE, Perella Weinberg's basis for choosing a range of 8.0x to 9.0x to apply to EV / 2013E EBITDA and 15.0x to 17.0x to apply to 2013E earnings per share.

91.     With respect to *Selected Transactions Analysis*, the Registration Statement fails to disclose various material aspects of Perella Weinberg's analysis, including:

(a)     The criteria used to select purported comparable transactions; and

(b)     Perella Weinberg's basis for selecting a representative range of multiples of 9.5x to 10.5x.

92.     With respect to the *Discounted Cash Flow Analysis of NYSE*, the Registration Statement fails to disclose various material aspects of Perella Weinberg's analysis, including:

(a)     Whether the Board expressed an opinion on whether the discounted cash flow analysis using the budget case or the volume growth case was a better indication of the Company's future business prospects and, if so, the Board's conclusions and rationale for the conclusions;

(b)     The Company's projections for capital expenditures and net working capital;

(c)     The criteria Perella Weinberg used in selecting the terminal value range of 7.75x to 8.25x; and

(d)     The basis for Perella Weinberg's decision to use discount rates ranging from 9.5% to 10.5%.

93.     With respect to the *Discounted Cash Flow Analysis of ICE*: the Registration Statement fails to disclose various material aspects of Perella Weinberg's analysis, including:

(a)     The Company's projections for capital expenditures and net working capital;

(b)     The basis for using discount rates ranging from 9% to 10%; and

(c)     The criteria Perella Weinberg used to select the terminal value range of 8.25x to 7.25x.

C.       **Material Omissions Concerning Morgan Stanley's Financial Analysis**

94.     The Registration Statement fails to disclose certain data and inputs underlying the financial analyses supporting the fairness opinion of Morgan Stanley, including:

95.     With respect to the *Selected Public Companies Analyses*, the Registration Statement fails to disclose various material aspects of Morgan Stanley's analysis, including:

(a)     All multiples and ratios for each of the comparable companies;

(b)     The criteria Morgan Stanley used to select which companies were comparable;

(c)     The basis for Morgan Stanley's decision to apply multiple ranges of 7.0 to 8.5x and 6.5x to 8.0x to NYSE's 2013 estimated adjusted EBITDA and 2014 estimated EBITDA, respectively;

(d)     The basis for Morgan Stanley's decision to use multiple ranges of 8.0x to 9.0x and 7.5x to 8.5x to ICE's 2013 and 2014 estimated EBITDA, respectively;

(e)     The basis for Morgan Stanley's decision to use multiple ranges of 10.0x to 13.0x and 9.0x to 11.0x to NYSE's 2013 estimated earnings and 2014 estimated earnings, respectively; and

(f)     The basis for Morgan Stanley's decision to use multiples ranges of 15.0x to 16.0x and 13.5x to 14.5x for ICE's 2013 and 2014 estimated earnings, respectively.

96.     With respect to the *Selected Transactions Analysis*, the Registration Statement fails to disclose various material aspects of Morgan Stanley's analysis, including:

        (a)        The multiples observed for each transaction;

        (b)        The objective criteria used to select the precedent transactions;

        (c)        The criteria Morgan Stanley used in selecting and applying a trailing 12-month EBITDA range of 10.0x to 11.5x;

        (d)        Morgan Stanley's basis for applying a trailing 12-month earnings range of 18.0x to 20.0x; and

        (e)        Morgan Stanley's basis for applying a selected premium range of 35% to 45%.

97.     With respect to the *ICE Discounted Cash Flow Analysis*, the Registration Statement fails to disclose various material aspects of Morgan Stanley's analysis, including:

        (a)        Morgan Stanley's basis for using a discount rate of 8.0% to 10.0%; and

        (b)        The conclusions Morgan Stanley drew from its analysis.

98.     With respect to the *NYSE Discounted Cash Flow Analysis*, the Registration Statement fails to disclose various material aspects of Morgan Stanley's analysis, including:

        (a)        The basis for Morgan Stanley's decision to use a terminal value multiple range of 7.0x to 8.5x; and

(b)      The basis for Morgan Stanley's decision to use a discount rate of 8.0% to 10.0%; and

### D.      Disclosures Concerning the Flawed Process

99.      The Registration Statement also fails to disclose critical information concerning the negotiations with Company A.

100.      Specifically, the Registration Statement discloses that on November 28, 2012, Company A submitted "an indicative proposal with a value lower than the ICE Proposal."  The Registration Statement fails to disclose the value or range of Company A's proposal.

101.      Additionally, the Registration Statement states that Company A indicated a deal "would be conditioned upon NYSE [] first selling its European derivatives business and obtaining a sale price for that business that met a minimum price specified by Company A."  In light of the Registration Statement's disclosure that on October 25, 2012 other parties had previously expressed interest in purchasing the Company and the most recent indication of interest concerned "components of NYSE [] derivatives business," the Registration Statement should, but fails to disclose, whether the Company contacted any parties previously interested in purchasing the Company, and the effect that a sale of NYSE's derivative business to a previously interested party in combination with the sale of the remainder of the Company to Company A would have relative to ICE's offer.

102.      The Registration Statements fails to disclose whether NYSE informed Company A that it had been in negotiations with ICE since October 2012 regarding a

potential transaction and that NYSE had been conducting due diligence since October 5, 2012, and if the Company did disclose this information to Company A, when did NYSE inform Company A and what was Company A's response.

103.    The Registration Statement states that at the October 25, 2012 Board meeting, "Members of management noted that NYSE [] had been approached in the past by other parties, the most recent being from a large U.S.-based derivatives exchange that expressed a potential but non-specific interest in components of NYSE [] derivatives business." The Registration Statement, however, fails to disclose how many parties contacted management, when the interested parties contacted management, what the discussions with each potential party entailed, and whether the Company reached out to any parties that previously indicated an interest to inquire whether they were interested in pursuing a transaction.

104.    The Registration Statement states that on December 12, 2012 Niederauer and other Board members met with Sprecher to "discuss the transaction and ICE's view of the combined Company." The Registration statement should disclose whether Niederauer's employment in the combined company was discussed, if so, whether he was present for the negotiations, the names of the Board members that attended, and whether any of the Board members that attended the meeting will be on the Board of the combined company.

105.    The Registration Statement fails to disclose whether the Board and/or other Company representatives considered and/or attempted to negotiation a collar

provision in the Merger Agreement, and if so, the nature of the negotiations and if not the reason the Board did not attempt to do so.

106.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### Brought Individually

107.     Plaintiff repeats all previous allegations as if set forth in full herein, excluding the class action allegations in ¶¶ 35-40.

108.     Defendants have issued the Registration Statement, which includes the joint proxy statement of NYSE and ICE, with the intention of soliciting shareholder support of the Proposed Transaction.

109.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

110.     Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants

should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

111.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

112.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

113.    Plaintiff repeats all previous allegations as if set forth in full herein.

114.    The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care and loyalty owed to the public shareholders of NYSE and have acted to put their personal interests ahead of the interests of NYSE shareholders.

115.    The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize NYSE's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

116.    The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the shareholders of NYSE because, among other reasons:

(a)    they failed to take steps to maximize the value of NYSE to its public shareholders and took steps to avoid competitive bidding;

(b)    they failed to properly value NYSE; and

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction.

117.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of NYSE's assets and will be prevented from benefiting from a value-maximizing transaction.

118.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

119.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III
### Breach of Fiduciary Duty – Disclosure
### (Against Individual Defendants)

120.    Plaintiff repeats all previous allegations as if set forth in full herein.

121.    The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting NYSE shareholders.

122.    As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

123.    As a result, Plaintiff and the Class members are being harmed irreparably. Plaintiff and the Class have no adequate remedy at law.

**COUNT IV**
**Aiding and Abetting**
**(Against ICE, and Merger Sub)**

124.    Plaintiff repeats all previous allegations as if set forth in full herein.

125.    As alleged in more detail above, Defendants ICE, and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.

126.    As a result, Plaintiff and the Class members are being harmed.

127.    Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)    declaring that the Registration Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(C)    enjoining, preliminarily and permanently, the Proposed Transaction;

(D)    in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)    directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(F)    awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)    granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated: February 4, 2013

Respectfully submitted,

LEVI & KORSINSKY LLP
Joseph E. Levi, Esq.
Shannon L. Hopkins, Esq.
Julia J. Sun, Esq.
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Plaintiff*